## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **Case No. 6:22-cr-95-PGB-DCI**

**JASON AARON BEATY**

---

## MOTION TO DISMISS INDICTMENT
## AND MEMORANDUM OF LAW

The Defendant, JASON BEATY, through counsel, moves this Court under Federal Rule of Criminal Procedure 12 to dismiss the indictment. Mr. Beaty contends that the statutes violate the Second, Fifth, and Tenth Amendments and exceed the enumerated powers granted to Congress by the United States Constitution.

Mr. Beaty is charged in a two-count indictment. Doc. 17. Count One alleges that Mr. Beaty,

> knowing that he was an unlawful user of a controlled substance as defined in 21 U.S.C. § 802, that is, cocaine, did knowingly possess, in and affecting interstate and foreign commerce, a Radical Firearms rifle, a Sarsilmaz pistol, and a Smith and Wesson pistol

in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). Count Two alleges that Mr. Beaty

> did knowingly possess a firearm, that is, two silencers, as defined by 26 U.S.C. § 5845(a)(7), and a Radical Firearms

1

> rifle with a barrel length of less than 16 inches, which
> converted the rifle to a short-barreled rifle, as defined by
> 26 U.S.C. § 5845(a)(3), which were not registered to the
> defendant in the National Firearms Registration and
> Transfer Record, as required by 26 U.S.C. § 5841

in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.

Mr. Beaty maintains that § 922(g)(3) is unconstitutional under the Second, Fifth, and Tenth Amendments, as well as an unconstitutional exercise of Congress's commerce power, and that § 5861(d) is unconstitutional under the Second and Tenth Amendments, as well as an unconstitutional tax.

The government opposes this motion.

## MEMORANDUM OF LAW

### I.   18 U.S.C. § 922(g)(3) is unconstitutionally vague and violates the Fifth Amendment guarantee of due process.

The government violates the Fifth Amendment's guarantee of due process "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) ("Vague laws contravene the 'first essential of due process of law' that statues must give people 'of common intelligence' fair notice of what the law demands of them." (citations omitted)).  "The prohibition of vagueness in criminal statutes is an essential of due process, required by both ordinary

2

notions of fair play and the settled rules of law." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (cleaned up).

"Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect" given the foundational principle that "[o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *Davis*, 139 S. Ct. at 2325 (citation omitted). Prohibiting vagueness in criminal statutes "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212. "In that sense, the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Id.* "[I]f the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, [it would] substitute the judicial for the legislative department." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.7 (1972)) (alterations in original).

Section 922(g)(3) is unconstitutionally vague, in violation of the Fifth Amendment's Due Process clause, both on its face and as applied to Mr. Beaty.[1]

---

[1] A statute can be facially void for vagueness even if it is not vague in all its applications. *Johnson*, 576 U.S. at 602-03.

Recently, another district court struck down § 922(g)(3) as facially unconstitutional based on vagueness. *United States v. Morales-Lopez*, 2022 WL 2355920, at *8 (D. Utah June 30, 2022), *appeal filed*, No. 22-4074 (10th Cir. Aug. 1, 2022)  As that court explained, the statute fails to properly notify ordinary people of what conduct constitutes a violation because it fails to define "unlawful user" and fails to give notice of what temporal nexus, if any, is required between unlawful drug use and the firearm possession. *Id.* at **8-9. In addition, § 922(g)(3) invites arbitrary enforcement and offends separation-of-powers principles because it invites the judiciary to perform the legislative function of defining a criminal offense. *Id.* at **8-10.[2] The *Morales-Lopez* court got it right, and Mr. Beaty adopts the court's reasoning and rationale. *See ibid.*

The plain text of § 922(g)(3) does not define "unlawful user."   To be sure, being an "unlawful user" is distinct from being "addicted to" a controlled substance because the statutory text joins two phrases in the disjunctive. *See United States v. Corona*, 849 F.2d 562, 562-63 nn.1-2 (11th Cir. 1988), *abrogated on other grounds by Jaffee v. Redmond*, 518 U.S. 1 (1996); 18 U.S.C. § 922(g)(3).  Even so, "[u]nlawful user" fails to give the ordinary person notice of what the law covers.  It is unclear whether it refers to a person who uses

---

[2] In addition, even if a clearly prohibited core of conduct could save the constitutionality of otherwise vague statutes after *Johnson*—which the court questioned, the court was "unable to divine such a core of conduct considering only the text of § 922(g)(3)." *Morales-Lopez*, 2022 WL 2355920, at *11.

drugs daily, weekly, monthly, annually, or a single time decades ago.  It is unclear whether it refers to someone who lawfully has a prescription for a controlled substance, but who ingests more than the prescribed amount. "'User,' without a modifying adjective, connotes neither regular nor irregular use; it only denotes use, rendering it impossible for ordinary persons to understand when the statute might apply to their level of drug use." *Morales-Lopez*, 2022 WL 2355920, at *8.

To be sure, the Eleventh Circuit has defined "unlawful user" as a person whose drug use is "regular, ongoing, and contemporaneous with his firearm possession." *United States v. Edmonds*, 348 F.3d 950, 953-54 (11th Cir. 2003); *see id.* (holding that to support an offense enhancement under USSG § 2K2.1(a)(6), "the government must show the defendant was an 'unlawful user' of a controlled substance during the same time period as the firearm possession").  But this judicially created definition does not make the statute any less vague.  What does regular, ongoing, and contemporaneous mean? "[H]ow does the ordinary person understand generic terms like "regular" or "ongoing" [or "contemporaneous"]?" *Morales-Lopez*, 2022 WL 2355920, at *10.[3] The statute is still vague, despite *Edmonds*.

---

[3] In *Morales-Lopez*, the court instructed the jury that an unlawful user was "one who had been using a controlled substance on a regular and ongoing basis at the time he was found to be in possession of a firearm."  2022 WL 2355920, at *10.  The "instruction apparently did little to help the jury understand what conduct § 922(g)(3) prohibits" because the jury requested elaboration on the meaning of "regular and ongoing basis."  *Id.*

Moreover, this judicial effort to rewrite the vague statute runs afoul of separation-of-powers principles. *See Morales-Lopez*, 2022 WL 2355920, at *10. "[T]he statute presents a paradigmatic example of the legislature casting an overly broad net and leaving the judiciary to determine who stays in the net and who does not." *Id.* (citing *Kolender*, 461 U.S. at 358 n.7). Because of the statute's vague nature, it is impossible to ascertain whether the way in which the Eleventh Circuit has narrowed the statute aligns with the prohibitions Congress intended to enact. *Id.*; *see Dimaya*, 138 S. Ct. at 1212. Mr. Beaty urges this Court to hold § 922(g)(3) unconstitutionally vague and dismiss Count One of Mr. Beaty's indictment.[4]

## II. 18 U.S.C. § 922(g)(3)'s prohibition on firearm possession by unlawful users of any controlled substance is not rooted in the Second Amendment's text and history and is unconstitutional.

Section § 922(g)(3) is also unconstitutional under the Second Amendment, both facially and as applied to Mr. Beaty's conduct.

### A. The Second Amendment and *Bruen*

---

[4] Mr. Beaty maintains that he may bring a facial vagueness challenge without first showing that § 922(g)(3) is unconstitutionally vague as applied to him. *See Dimaya*, 138 S. Ct. at 1214 n.3; *Johnson*, 576 U.S. at 602-03. However, he acknowledges Eleventh Circuit cases prior to *Johnson* and *Dimaya* stating that vagueness challenges must be evaluated in light of the facts of the case at hand. *See United States v. Marte*, 356 F.3d 1336, 1342 (11th Cir. 2004) (citing *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002)). He respectfully submits that *Johnson* and *Dimaya* undermine *Marte* to the point of abrogation. In any event, to the extent the Court needs additional factual development to decide Mr. Beaty's as-applied and/or facial challenges to § 922(g)(3), Mr. Beaty requests an evidentiary hearing and/or an opportunity to preserve and renew this Motion after evidence is presented at trial.

The Second Amendment's operative clause provides that "the right of the people to keep and bear Arms shall not be infringed."  U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment protects an individual's right to keep and bear arms for self-defense, both in the home and in public.  *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122, 2125 (2022) (outside the home); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (in the home).  Regulations that do not respect that right are unconstitutional.  *Bruen*, 142 S. Ct. at 2122.

In *Bruen*, the Supreme Court explicitly articulated the standard for evaluating whether a law respects the Second Amendment.  142 S. Ct. at 2129-30.  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.*; *see also id.* at 2127 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").  The Court further explained that "[o]nly then may a court conclude that the individual's conduct falls outside the Second Amendment[ ]."  *Id.* at 2130; *see id.* at 2135 ("Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment . . . does not protect petitioners' proposed course of conduct.").

7

Thus, a court should not engage in any interest balancing or means-end scrutiny. *Id.* at 2127–30.[5]  Rather, the *Bruen*/*Heller* methodology for Second Amendment challenges centers on "constitutional text and history."  142 S. Ct. at 2128-29; *id.* at 2131.[6]

Whether the government has met its burden is a "straightforward historical inquiry" when the challenged regulation addresses a "general societal problem that has persisted since the 18th century." *Id.* at 2131.  In those cases, the lack of a "distinctly similar historical regulation addressing that problem" is evidence that the challenged regulation is inconsistent with the Second Amendment.  *Id.*[7]  Alternatively, challenges to regulations implicating "unprecedented societal concerns or dramatic technological changes" will involve "reasoning by analogy" to determine whether historical and modern regulations are "relevantly similar," at least in "how and why"

---

[5] *Bruen* rejected the second step of the popular two-step approach developed by the Courts of Appeals, including the Eleventh Circuit.  142 S. Ct. at 2125-27; *see e.g., United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017).  Step one required the government to prove that the regulated conduct falls beyond the original scope of the right based on its historical meaning. *Id.* at 2126; *Focia*, 869 F.3d at 1285.  *Bruen* recognized that step one was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."  142 S. Ct. at 2127.  But step two, which balanced the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms, was "one step too many."  *Id.*

[6] Under the *Bruen*/*Heller* framework, the Second Amendment is "widely understood" to have codified a pre-existing right, the bounds of which are determined according to "*the public understanding* of [the text] in the period after its enactment or ratification."  *Bruen*, 142 S. Ct. at 2128.

[7] Other evidence of the unconstitutionality of a modern regulation may include efforts to address the societal problem through materially different means and rejected attempts to enact analogous regulations as unconstitutional.  *Bruen*, 142 S. Ct. at 2131.

they "burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33.

The relevant historical record is the founding era when the Second Amendment was adopted in 1791. *Id.* at 2136. And the government must demonstrate a robust historical tradition of analogous firearms regulation and cannot make that showing with a handful of outliers.[8]

**B. The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(3) and it is presumptively protected by the Second Amendment.**

Section 922(g)(3) prohibits the "possess[ion]" of "any firearm" by "an unlawful user of a controlled substance"—conduct that is clearly covered by the Second Amendment's right of "the people" to "keep and bear Arms." There is no question that possessing firearms in the home[9] constitutes "keep[ing]"[10] and that the firearms listed in Count One—a rifle and two pistols—are "arms."[11] And the plain text of the Second Amendment covers unlawful users,

---

[8] The Court in *Bruen* doubted, for example, "that *three* colonial regulations could suffice" to establish a historical tradition. *Id.* at 2142. And the Court disregarded two "unusually broad" antebellum regulations as unrepresentative. *Id.* at 2148 n.24. The Court also dismissed the law of two states from the late 19th century for being "outliers" that "provide little insight into how postbellum courts view the right to carry protected arms." *Id.* at 2153. Indeed, *Bruen* cautions against upholding "every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* at 2133 (cleaned up).

[9] The firearms listed in Count One were seized from Mr. Beaty's home.

[10] To "keep arms" means to "have weapons" or "possess arms." *Heller*, 554 U.S. at 582, 583; *see id.* at 592.

[11] The definition of "arms" applies to "those arms in existence in the 18th century" and "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132; *see also Heller*, 554 U.S. at 581-82; *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per

who are among "the people."[12]   Indeed, nothing in the Second Amendment makes a distinction between people who are unlawful users and people who aren't. *Cf. Bruen*, 132 S. Ct. at 2134 (noting the absence of a home/public distinction in the Second Amendment's text).   Therefore, the conduct regulated by § 922(g)(3) is presumptively protected by the Second Amendment, and the government has the burden of affirmatively proving that § 922(g)(3)'s regulation based on status as an unlawful user of a controlled substance is consistent with the Nation's historical tradition of firearm regulation.

### C. The government cannot meet its burden of affirmatively proving that § 922(g)(3) is consistent with the Nation's historical tradition of firearm regulation.

The use of intoxicants is not a new problem for American society.   Section 922(g)(3) endeavors to address a "general societal problem that has persisted since the 18th century." *Bruen*, at 2131. It does so by flatly banning users of intoxicants from possessing firearms—even in the home and when not intoxicated.   Because the government cannot affirmatively prove a robust

---

curiam).  In *Heller*, the Supreme Court explained that the "[t]he 18th-century meaning" of "arms" is "no different from the meaning today."   554 U.S. at 581.  The Court consulted Colonial-era dictionaries and defined "arms" as "[w]eapons of offence, or armour of defence" and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  *Heller*, 554 U.S. at 581 (cleaned up).

[12] "[T]he people" is a term of art in the Constitution that "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.  As such, there is a "strong presumption" that the Second Amendment right "belongs to all Americans." *Id.* at 581; *see Bruen*, 142 S. Ct. at 2156.

historical tradition of "distinctly similar historical regulation[s]" from the Colonial era, § 922(g)(3) is unconstitutional.

And even if § 922(g)(3) implicates "unprecedented societal concerns or dramatic technological changes," the government cannot affirmatively prove by "reasoning by analogy" that historical and modern regulations are "relevantly similar," at least in "how and why" they "burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. This Court should dismiss Count One because the statute violates the Second Amendment.

### III. 26 U.S.C. § 5861(d)'s prohibition on possession of unregistered firearms is not rooted in the Second Amendment's text and history and is unconstitutional.

Mr. Beaty incorporates the discussion of *Bruen* and the Second Amendment from Part II.A. of this Motion. Applying the *Bruen* framework, 26 U.S.C. § 5861(d) is unconstitutional, both facially and as applied to Mr. Beaty's conduct. This Court should dismiss Count Two of the indictment because it violates the Second Amendment.

#### A. The National Firearms Act

In 1934, Congress enacted the National Firearms Act (NFA) as "a regulatory measure in the interest of public safety." *United States v. Freed*, 401 U.S. 601 (1971); *see also Staples v. United States*, 511 U.S. 600, 627 (1994) (Stevens, J., dissenting) (the NFA "is primarily a regulatory measure"). Regarding the NFA, Justice Stevens explained:

> Congress fashioned a legislative scheme to regulate the commerce and possession of certain types of dangerous devices, including specific kinds of weapons, to protect the health and welfare of the citizenry. To enforce this scheme, Congress created criminal penalties for certain acts and omissions.

*Staples*, 511 U.S. at 630 (1994) (Stevens, J., dissenting); *see also* National Firearms Act:  Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 8 (1934); Rept. No. 1780, Committee on Ways and Means, U.S. House of Representatives, 73rd Cong., 2d Sess. 2 (1934); Rept. No. 1444, Committee on Finance, U.S. Senate, 73rd Cong., 2d Sess. 1 (1934).  This regulatory scheme with criminal penalties evolved, and in 1958, Congress added the provision criminalizing the possession of unregistered firearms.  26 U.S.C. § 5861(d); *see* Pub. L. 85-859, Title II, § 203(i)(1), 72 Stat. 1428 (Sept. 2, 1958).

Now, the NFA imposes stiff criminal penalties on anyone who possesses a short-barreled rifle or suppressor that is not registered in the National Firearms Registration and Transfer Record.  *See* 26 U.S.C. § 5841 (requiring registration of certain firearms), § 5845(a) (defining "firearm"),[13] 5861(d)

---

[13] The term "firearm" is defined in 26 U.S.C. § 5845(a) and includes "a rifle having a barrel or barrels of less than 16 inches in length," *see* 26 U.S.C. § 5845(a)(3), and "any silencer" as defined in 18 U.S.C. § 921.  *See* 26 U.S.C. § 5845 (a)(7).  And 18 U.S.C. § 921(a)(24) defines "firearm silencer" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer . . . and any part intended only for use in such assembly or fabrication."  18 U.S.C. § 921(a)(24).

(prohibiting possession of an unregistered firearm), 5871 (providing for penalties of $10,000 and ten-years imprisonment).

### B. The plain text of the Second Amendment covers the conduct required by § 5841 and prohibited by § 5861(d), so the Second Amendment presumptively protects that conduct.

The NFA—§ 5861(d) in particular—applies to all "people" and all possessions of unregistered NFA firearms—even possessing such firearms in the home for self-defense or confrontation. *See supra* at II.B. & n.10, n.12. And "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582; *see also Bruen*, 142 S. Ct. at 2132. Indeed, the Second Amendment's definition of "arms" both applies to "those arms in existence in the 18th century" and "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132; *see also supra* at II.B. & n.11. As such, the plain text of the Second Amendment covers the firearms described in §§ 5845(a) and 5861(d)—at least the short-barreled rifle and silencers charged in Mr. Beaty's indictment.

Therefore, the conduct regulated by §§ 5841 and 5861(d) is presumptively protected by the Second Amendment. The government has the burden of affirmatively proving that § 5841's regulation and § 5861(d)'s prohibition are consistent with the Nation's historical tradition of firearm regulation.

## C. The government cannot meet its burden of affirmatively proving that § 5861(d) is consistent with the Nation's historical tradition of firearm regulation.

Short-barreled arms existed in the 18th century, but the government cannot prove a robust historical tradition of regulating them. Also, although the Supreme Court has limited Second Amendment protection to the possession and use of weapons that are in common use by recognizing a historical tradition of prohibiting the carrying of dangerous and unusual weapons, *see Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627), the government cannot meet its burden of proving that NFA firearms—short-barreled rifles and suppressors—are dangerous and unusual, such that they do not meet the common use test. And the government cannot demonstrate any other historical tradition requiring registration of such firearms and prohibiting their possession when unregistered.

### 1. Short-barreled arms existed during the 18th century, were common during the founding era, and remain common today.

While regulation of short-barreled firearms is relatively new, dating only to the passage of the NFA in 1934, the existence of short-barreled weapons is not. *See* James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 508 (2017) ("Short-barrel firearms, unlike modern 'assault weapons,' *did* exist at the time of the Second Amendment's drafting and ratification."). Various versions of the blunderbuss,

14

firearms "boasting very short barrels, were popular for self-defense and occasionally used by militaries." *Id.* at 503.  The American Revolution Institute has an eighteenth-century blunderbuss in its collection, "a type that was carried by British troops during the American Revolution," with "a short, large-caliber barrel just shy of fifteen inches."[14]  The Royal Armouries collection contains several examples of blunderbusses with barrels under 15 inches.[15] And the Paget Carbine, with a barrel length of 16 inches, was introduced in the United Kingdom as early as 1800.[16]

In addition, "[b]ecause of their size and tactical maneuverability, short-barrel firearms are ideal for self-defense." *Id.* at 512.  Like a handgun—"the quintessential self-defense weapon"—short-barreled firearms are well-suited to self-defense, in the home or in public. *Heller*, 554 U.S. at 629.  And "short-barreled rifles and shotguns have becoming increasingly popular for home

---

[14] The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/ (last visited Nov. 8, 2022).

[15] Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss—By Wheeler (about 1795)*, https://collections.royalarmouries.org/object/rac-object-30588.html (last visited Nov. 8, 2022); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss—By J. Harding and Son (dated 1840)*, https://collections.royalarmouries.org/object/rac-object-15338.html (last visited Nov. 8, 2022) (engraved "For Her Majesty's Mail Coaches"); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss-By James Barbar (1755)*, https://collections.royalarmouries.org/object/rac-object-15012.html (last visited Nov. 8, 2022).

[16] Royal Armouries Collections, *Short Light Cavalry Carbine (Paget Carbine) (About 1800-1808)*, https://collections.royalarmouries.org/battle-of-waterloo/arms-and-armour/type/rac-narrative-569.html (last visited Nov. 8, 2022); *see also* Royal Armouries Collections, *Flintlock muzzle-loading carbine—Short Light Cavalry Carbine (Experimental Paget Carbine) (About 1805)*, https://collections.royalarmouries.org/object/rac-object-567.html (last visited Nov. 8, 2022).

defense and defensive-skills-based marksmanship training and competitions . . . ." (See NRA-ILA website, https://www.nraila.org/get-the-facts/national-firearms-act-nfa/, last accessed November 7, 2022). Over a half-million short-barreled rifles are registered with the federal government.[17] The only reason they are not more popular for self-defense is because they are heavily, slowly, and unconstitutionally regulated.[18]

Under *Bruen* and *Heller*, "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *Heller*, 554 U.S. at 624 (explaining that the Second Amendment protects "arms 'in common use at the time' for lawful purposes like self-defense"); *United States v. Miller*, 307 U.S. 174, 179 (1939) (holding that short-barreled shotguns—as opposed to short-barreled rifles—are not protected by the Second Amendment). By contrast, there is a historical tradition of prohibiting the carrying of dangerous and unusual weapons. *Id.* Short-barrel rifles are no more dangerous or unusual than the handguns

---

[17] Currently, 532, 725 short-barreled rifles are registered with the federal government. *See* Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the United States:     Annual     Statistical     Update     2021,     at     16     (Ex.     8), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed Nov. 7, 2022).
[18] Bills to remove short-barreled rifles from the definition of firearms for purposes of the NFA have been introduced in the House and Senate. *See* Home Defense and Competitive Shooting Act of 2021, H.R. 1758, S. 803, 117th Cong. (2021).

protected by *Bruen* and *Heller*.[19]  And like handguns, a common use of a short-barreled rifle is self-defense.  There is no basis to exclude short-barreled rifles from the protection of the Second Amendment.

### 2. The government cannot prove distinctly similar historical regulation of silencers (suppressors).

As "instruments that facilitate armed self-defense," silencers are covered by the plain text of the Second Amendment's definition of "arms."  *Bruen*, 142 S. Ct. at 2132.  Silencers improve accuracy by reducing muzzle flinch and the disorientation that can follow a loud shot.  *See* A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense,* 97 Marq. L. Rev. 853, 892 n.221 (2014) (quoting firearms instructor's warning: "[I]f you fire that shotgun it's going to be extremely loud, and you will probably lose your hearing for a few minutes.  Those few minutes can be vital, because the intruder now knows where you are and you're unable to be as alert as you normally would."); Stephen P. Halbrook, *Firearm Sound Moderators:  Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 69 (2015-16) ("Legitimate advantages could also be listed for a suppressor, whether used for sporting purpose or for self-defense – reduction of noise, recoil, and muzzle rise immediately come to mind.").  Silencers are thus valuable for home-

---

[19] As Justice Thomas pointed out, unlawfully possessing even a short-barreled shotgun does not describe inherently dangerous conduct.  *Johnson v. United States*, 576 U.S. 591, 610 (2015) (Thomas, J., concurring).

defense – the "core lawful purpose" of firearms ownership recognized by *Heller*. 554 U.S. at 629-30. The person who reaches for a firearm to protect against an intruder does not want to pause and don earmuffs or earplugs to prevent the health and safety fallout of unsuppressed gunfire, and certainly does not want to muffle the sounds of the surrounding environment in order to protect his or her hearing.

Silencers are also in common use for self-defense today.  As of May 2021, over 2.6 million silencers are registered with ATF.[20]  But the use of silencers to commit crimes is exceedingly rare.  S. Gutowski, *ATF:  1.3 Million Silencers in U.S. Rarely Used in Crimes*, Washington Free Beacon (Feb. 17, 2017) (only .003 percent of silencers are used in crimes each year); Halbrook, 46 Cumb. L. Rev. at 63-67 ("use of silenced firearms in crime is a rare occurrence, and is a minor problem"); *State v. Langlois*, 2 N.E. 3d 936, 957 (Ohio Ct. App. 2013) ("the use of suppressors in gun crimes generally and in homicides specifically is extremely infrequent, and the criminal use of a registered suppressor is virtually nil relative to their widespread ownership").  According to one news source, "[d]ata from the ATF show that silencers are seldom used in crime. From 2012-15, 390 silencers were recovered from crime scenes where an ATF

---

[20] In May 2021, 2,664,774 silencers were registered with the federal government.  *See* Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (Ex. 8), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed Nov. 7, 2022).

trace was requested.  During that same period, more than 600,000 pistols were recovered."  Nathan Rott, *Debate Over Silencers:  Hearing Protection or Public Safety Threat?,* All Things Considered (NPR Mar. 21, 2017).[21]  Another study of silencer-related prosecutions reported in Westlaw and Lexis from 1995 to 2005 found only 153 cases "in which the evidence suggests a silencer was used for a criminal purpose."  Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 Western Criminology Rev. 44, 49-51 (2007).[22]  More than 80% of those cases involved non-violent victimless crimes.  *Id.*  Only two reported federal cases in the 10-year study involved a silencer used in a murder.  *Id.*    In contrast, "ordinary firearms are far more likely to be actively employed, as well as used to injure a victim."  *Id.*

In sum, silencers are instruments that facilitate armed self-defense and protected by the Second Amendment.  They are not dangerous and unusual; they are in common use today.  And the government has the burden of demonstrating a robust history of distinctly similar regulation of silencers.  Because the government cannot, this Court should dismiss Count 2.

> **3. Taxation and registration of short-barreled rifles and silencers burdens rights protected by the Second Amendment and has no historical basis.**

---

[21]    http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat.

[22] http://www.westerncriminology.org/documents/WCR/vo8n2/clark.pdf.

By imposing tax and registration and authorization requirements on the making, possession, and transfer of silencers, the NFA undoubtedly imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  Even though the NFA does not outrightly ban short-barreled rifles and silencers, it imposes unconstitutional burdens on the people.   The registration requirements, for example, can entail "wait times of several months to a year."  D'Cruz, 40 Harv. J.L. & Pub. Pol'y at 511.  And the Supreme Court has made clear that the Constitution prohibits the government from imposing even de minimus burdens on fundamental rights.  *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008); *Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 592-93 (1983).  As the Court observed in *Minneapolis Star*, the power to single out certain conduct for taxation "gives a government a powerful weapon against the taxpayer selected."   460 U.S. at 585.  And Justice Kavanaugh has suggested that "registration of all lawfully possessed guns is not permissible under the Second Amendment."  *Heller v. District of Columbia*, 670 F.3d 1244, 1293 (D. C. Cir. 2011) (Kavanaugh, J., dissenting).  The *Bruen* case itself did not involve an outright ban, but a licensing scheme that required an application to demonstrate a special need for self-defense in order to carry handguns publicly. 142 S. Ct. at 2122.  Like other regulations that burden constitutional rights,

therefore, the restrictions on owning short-barreled rifles and silencers must pass *Bruen's* historical test.

The burden is on the government to prove that the restrictions imposed by the NFA are historically based.  It cannot do so.  No regulations during the founding era taxed and registered short-barreled arms and suppressors or criminalized the possession of unregistered short-barreled arms and suppressors.  The NFA taxation and registration requirements regulations have no historical analogue, let alone the criminalization of possession of unregistered arms.

In sum, this Court needs to evaluate § 5861(d) anew, in light of *Bruen*, relying on *Bruen's* originalist framework, examining this Nation's history and tradition of firearms regulation, and find that the taxation, registration, and criminalization of failure to do so is not part of that history and tradition.  Mr. Beaty asks this Court to hold that the statute is unconstitutional and dismiss Count 2.[23]

### IV.   The NFA imposes an unconstitutional tax on firearm transfers that is unrelated to an administrative costs associated with the exercise of Second Amendment rights.

The Eleventh Circuit has upheld the NFA both facially and as applied as an exercise of Congress's taxing power.  *United States v. Bolatete*, 977 F.3d 1022,

---

[23] To the extent this inquiry requires a factual determination, Mr. Beaty respectfully requests an evidentiary hearing.

1033-34 (11th Cir. 2020) (citing *United States v. Spoerke*, 568 F.3d at 1245-46 (11th Cir.)).   But the NFA's tax is unrelated to any administrative costs associated with the exercise of Second Amendment rights, and therefore it is an unconstitutional tax that exceeds Congress's enumerated power.   This Court should dismiss Count Two of the Indictment.

The government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). Although the government may collect a fee to defray administrative costs associated with the exercise of a constitutional right, it cannot impose a general revenue tax on the exercise of such a right.   *Id.*; *Cox v. New Hampshire*, 312 U.S. 569, 576-77 (1941).   Often referred to as "fee jurisprudence," the *Murdock/Cox* principles are most often applied in the First Amendment context.   *See, e.g., Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301-1314-15 (11th Cir. 2003) (holding that "a licensing fee on adult entertainment establishments is controlled by *Cox* and *Murdock* and must be reasonably related to recouping the costs of administering the licensing program").   But the Second Amendment is not a second-class right.   *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion) (stating that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees")). And so the "fee jurisprudence" of *Murdock/Cox* applies equally to the exercise of

the Second Amendment. *See Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017); *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013).[24]

The NFA imposes impermissible fees on the exercise of Second Amendment rights and violates the *Murdock/Cox* principles. It is a general revenue-raising measure unrelated to the cost of administering the program targeted at an activity—manufacturing, buying, and selling arms—but rather is expressly designed to suppress exercise of the right to keep and bear arms protected by the Second Amendment. As a tax, it is an unconstitutional tax on the exercise of a right protected by the Second Amendment.[25] This Court should dismiss Count Two.

**VI. For purposes of further review, § 922(g)(3) is unconstitutional, facially and as applied, because it exceeds Congress's constitutional authority under the Commerce Clause.**

To preserve the issue for further review, Mr. Beaty asserts that § 922(g)(3) is unconstitutional facially and as applied because Congress

---

[24] The Eleventh Circuit "has not decided whether it is appropriate to apply the fee jurisprudence of *Murdock* and *Cox* in the context of Second Amendment rights." *Bolatete*, 977 F.3d at 1035. In light of *Bruen*, however, it is clear those principles apply with equal force in the Second Amendment context.

[25] Although the Supreme Court upheld the NFA tax against a Second Amendment challenge in *Miller*, 307 U.S. 174, that case did not challenge the NFA tax as a tax on the exercise of a constitutional right. Moreover, the Supreme Court later warned against giving too much weight to the *Miller* decision: "It is particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623.

exceeded its authority under the Commerce Clause.  *See* U.S. Const. art. I, § 8, cl. 3.[26]

Congress's power to regulate under the Commerce Clause is limited to three categories: (1) "channels of interstate commerce," (2) "instrumentalities of interstate commerce," and (3) "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *see also United States v. Morrison,* 529 U.S. 598 (2000).  Section 922(g)(3) does not fit within any of the three *Lopez* categories.  Mere possession of a firearm is not an economic activity.  *See Lopez*, 514 U.S. at 561, 567.  Section 922(g)(3) prohibits an intrastate, non-economic activity by a class of individuals (unlawful users of any controlled substance) and does not ensure that their mere possession substantially affects interstate commerce.

Section 922(g)(3)'s "jurisdictional hook" is not dispositive of the constitutional analysis; it does not magically transform the non-economic activity of possessing a firearm into an economic activity.  *See United States v. Chesney*, 86 F.3d 564, 580 (6th Cir. 1996) (Batchelder, J., concurring); *see also Alderman v. United States*, 131 S. Ct. 700, 702 (2011) (Thomas, Scalia, JJ.,

---

[26] Mr. Beaty acknowledges that this Court is bound by prior Eleventh Circuit precedent to deny relief on this ground. *See, e.g., United States v. Jordan*, 635 F.3d 1181, 1189 (11th Cir. 2011). He nevertheless respectfully submits that precedent is improperly based on *Scarborough v. United States*, 431 U.S. 563 (1977), a case involving statutory rather than constitutional interpretation that is no longer good law after *United States v. Lopez*, 514 U.S. 549, 558-59 (1995).

dissenting from the denial of certiorari) (stating that the constitutional analysis ought not be "reduce[d] . . . to the mere identification of a jurisdictional hook"). And even if the firearm must have once crossed state lines in the past, the felon who later possesses it is not perpetually engaged in interstate commerce. *Cf. Jones v. United States*, 529 U.S. 848, 850-51 (2000) (rejecting the argument that noncommercial, owner-occupied residences were perpetually used in interstate commerce by receiving utilities that have an interstate connection). Congress's Commerce Clause powers do not permit it to criminalize the purely intrastate possession of a firearm or ammunition simply because the firearm or ammunition crossed state lines at some time in the past. Congress does not have a police power. Exceeding the Commerce Clause power runs afoul of the Tenth Amendment.

## CONCLUSION

For the reasons stated herein, Mr. Beaty asks this Court to dismiss Counts 1 and 2 of the indictment because the statutes are unconstitutional. Due to the complex nature of these issues, and because some of the issues involve burden-shifting to the government, Mr. Beaty anticipates asking this Court for leave to reply to the government's response. He also requests a hearing on this motion to dismiss.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender, MDFL

/s/ Michael S. Ryan
Michael S. Ryan, Esq.
Assistant Federal Defender
Arizona Bar No. 0018139
201 S. Orange Avenue, Suite 300
Orlando, FL 32801
Telephone: 407-648-6338
Fax: 407-648-6095
E-Mail: michael_ryan@fd.org

## Certificate of Service

Undersigned electronically filed the foregoing with the Clerk of the Court (CM/ECF) by using the CM/ECF system which will send a notice of electronic filing to Michael P. Felicetta, Assistant United States Attorney, this 8th day of November 2022.

/s/ Michael S. Ryan
Attorney for Defendant