UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 6:22-cr-95-PGB-DCI

JASON AARON BEATY

**UNITED STATES' REPSONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS INDICTMENT**

The United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, through the undersigned, opposes defendant's motion to dismiss the two counts of the Indictment (Doc. 42).

MEMORANDUM OF LAW

Defendant claims that both counts of the indictment pending against him, charging § 922(g)(3) and § 5861, are unconstitutional and must be dismissed. These violations fall within Congress's enumerated or inherent powers. They are not unconstitutionally vague as applied, and do not offend the Second Amendment. No further evidentiary hearing is needed to decide the motion. We respectfully ask this Court to deny his motion in all respects.

I.     **The *Heller* and *Bruen* Decisions**

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court decided that the Second Amendment's right to keep and bear arms protects an individual right to possess and use a firearm for lawful purposes, such as self-defense within the home. This is a personal right unconnected to service in the militia.

However, "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626. The Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*. at 625.

On June 23, 2022, the Supreme Court issued *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Court held that the Second Amendment, as incorporated against the States through the Fourteenth Amendment, "protect[s] an individual's right to carry a handgun for self-defense outside the home." The Court held unconstitutional a New York state law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home, which New York courts had construed to require "a special need for self-protection distinguishable from that of the general community." The Court explained that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."

In its opinion, the Court articulated the legal standard for reviewing Second Amendment claims. The Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," placing on the government the burden to "demonstrate" that a firearms

regulation "is consistent with this Nation's historical tradition of firearm regulation." This "historical inquiry … will often involve reasoning by analogy," in which courts examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." To justify a modern regulation, the government need "only … identify a well-established and representative historical analogue, not a historical twin."

The Court emphasized that while it was not granting "a regulatory blank check," it also was not imposing "a regulatory straightjacket." The Court reaffirmed *Heller* and its discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," deeming it "settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."

## II.   § 922(g)(3) is Constitutional

This restriction does not run afoul of the Second Amendment, because the right described by the Second Amendment only extends to "the people"—i.e. "law-abiding, responsible" citizens keeping or bearing arms for "lawful purposes." *See Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156.

In *Heller*, the Supreme Court held that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. This interpretation of the Second Amendment's meaning "accords with the historical understanding of the scope of the right." *Id*. Further,

*Heller* expressly contemplated that certain citizens were "disqualified" from keeping or bearing arms under Second Amendment. *Id*. at 635.

Similarly, in *Bruen*, the Court began its textual analysis by underscoring "that petitioners . . . —two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134. *Bruen* did not question the constitutionality of "shall-issue" concealed-carry licensing regimes, employed by states, that "require applicants to undergo a background check or pass a firearms safety course" to ensure that "those bearing arms" are "'law-abiding, responsible citizens.'" *Id*. at 2138 n.9.

Because both *Bruen* and *Heller* define the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156, or "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2122, 2134, unlawful users of controlled substances fall outside the Second Amendment's protection. In sum, those who habitually, unlawfully use controlled substances are neither "law-abiding" or "responsible," and therefore are not guaranteed the right to possess firearms under the Second Amendment.

Moreover, excluding habitual lawbreakers from "the people" as contained the text of the Second Amendment is consistent with scholarly opinions on the subject. As the Ninth Circuit observed in *United States v. Vongxay*,

> [M]ost scholars of the Second Amendment agree that the right to bear arms was "inextricably . . . tied to" the concept of a "virtuous citizen[ry]" that would protect society through "defensive use of arms against criminals, oppressive officials, and foreign enemies alike," and that "the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).

594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986)); *see also* THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 40 (Boston, Little Brown & Co. 1890) (explaining that constitutions protect rights for "the People" excluding, among others, "the idiot, the lunatic, and the felon").

Several courts recently examining this issue, in light of *Bruen,* have agreed, and ruled in favor of the government. *See*, *United States v. Holton*, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022); *United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Daniels*, 2022 WL 2654232 (S.D. Miss. July 8, 2022).

## A. History of § 922(g)(3)

In *United States v. Yancey*, 621 F.3d 681 (2010), the Seventh Circuit thoroughly explores the legislative history of § 922(g)(3). The original version of that provision was enacted as part of the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, and read: "It shall be unlawful for any person— . . . who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug . . . to ship or transport any firearm or ammunition in interstate or foreign commerce." Pub. L. No. 90-618, § 102, 82 Stat. 1213. The statute was subsequently amended by the Firearms Owners' Protection Act, to more current language, incorporating the new federal terminology related to "controlled substances." Pub. L. 99-308, § 102, 100 Stat. 449 (1986). The Gun Control Act provided a summary of Congress's purpose for the new regulations contained in Section 922(g):

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight

> against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on lawabiding citizens with respect to the acquisition possession, or use of firearms appropriate to the purpose of . . . personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes . . .

Pub. L. No. 90-618, § 101, 82 Stat. 1213. This prefatory purpose to the statute accords with other contemporaneous legislative materials, which shed additional light on what societal problems Congress sought to address with § 922(g). *See* S. REP. NO. 90-1501, at 22 (1968) ("The ready availability; that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern").

Indeed, the Supreme Court has interpreted the Omnibus Crime Control Act and Safe Street Act, as amended by the Gun Control Act and subsequent amendments, as evincing a congressional purpose of keeping firearms out of the hands of criminals. *See Scarborough v. United States*, 431 U.S. 563, 572 (1977) (holding the legislative history of these statutes supports the view that Congress sought disarm those who may not be trusted to possess a firearm); *Barrett v. United States*, 423 U.S. 212, 220 (1976) (explaining that the "principal purpose" of federal gun control legislation "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency"); *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (same).

## B. § 922(g)(3) relates to an extensive historical tradition.

As *Bruen* instructs, appropriate historical analogues to § 922(g)(3) will be similar in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132–33. The statute prohibits possession by an individual who is an addict or unlawful user of a substance as defined in the Controlled Substances Act. This does not function as a permeant ban on possession. The duration of the prohibition is subject only to the individual's addiction or unlawful use. To put it simply, the individual, not the government, controls the length of the prohibition against ownership or possession.

An individual addicted to an unlawful substance is similar to prohibitions against individuals with an "unsound mind" or under the influence of an intoxicant. The regulation at issue does not need to find an exact copy of the regulation in the nation's history of firearm regulations, but there needs to be a reasonably similar prohibition. "Unlike the lifetime bans that typically apply today, prohibited persons in the founding era could often regain their rights once they were no longer perceived as dangerous."[1] There is a tradition within our Nation's history of individuals who were once perceived as dangerous, that once that perception is removed, they are once again able to possess firearms. In 1637, supporters of Anne Hutchinson, who had lost their right to possess arms, regained their right once they confessed their sins. In Maryland, individuals who refused to take an oath of allegiance to King

---

[1] Greenlee, Joseph G.S. (2020) "The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms," *Wyoming Law Review.* Vol. 20 : No. 2., Article 7.

George III were disarmed. Virginia exempted from disarmament individuals willing to take the oath to the King. *Id*. at 263.

In 1779, Pennsylvania disarmed any individual who did not take an oath of allegiance to either Pennsylvania or to any other state. In 1775, Connecticut law disarmed individuals deemed "inimical" only until such a time as that individual could prove their loyalties. "Many disarmament acts provided exemptions for prohibited persons who swore loyalty to the king." *Id*. at 265-68.

In response to the Shay Rebellion in 1786, the following year, the Massachusetts legislature passed a law which set out how pardons could be issued to the individuals that had participated in the rebellion. In order to obtain the pardon, the individual had to take an oath of allegiance to the state and surrender their firearms for a period of three years.[2] The above historical examples highlight that there is a tradition of gun regulations within our history that temporarily prohibit possession by people perceived as dangerous.

The ability to own or possess a firearm under § 922(g)(3) is rooted in our Nation's historical tradition of limiting access to firearms to individuals the State deems dangerous at a particular moment. In 1881, Florida passed an Act which prohibited the selling of firearms to persons of unsound minds.[3] In 1911, Cook County, Illinois had a law which refused individuals that did not have a good moral

---

[2] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487 (2004).

[3] 1881 Fla. Laws 87, An Act to Prevent the Selling, Hiring, Bartering, Lending, or Giving to Minors under Sixteen Years of Age, or to any person of unsound mind, certain Firearms or other dangerous weapons.

character to obtain a permit to carry a gun.[4] Other laws prohibited firing weapons while under the influence of alcohol.[5] The territory of Arizona prohibited individuals from possessing on their person firearms while under the influence of intoxicating liquor of any kind.[6] In 1868, Kansas prohibited individuals from openly carrying weapons if they were under the influence of intoxicating drink.[7] A short time later, Kansas prohibited the transfer or sale of weapons to individuals of notoriously unsound mind.[8]

An individual unlawfully using or addicted to a control substance is not of "sound mind." And throughout this Nation's history and tradition of regulating firearms, multiple laws and acts have been passed which regulates the ownership or possession of firearms by individuals who are of unsound mind or under the influence of intoxicating substances.

In *United States v. Seay,* 620 F.3d 919 (8th Cir. 2010), the court found that there existed historical traditions of regulating firearms to those under the influence of intoxicants. "[W]e find that § 922(g)(3) is the type of 'longstanding prohibition on the possession of firearms' that *Heller* declared presumptively lawful." *Id*. at 925. See also *Fried v. Garland*, 2022 WL 16731233 ("The challenged laws [§ 922(g)(3)] are consistent with the history and tradition of this Nations' firearm regulation.").

---

[4] Cook County Ordinance chap. 53 of Chicago Code of 1911.
[5] Spitzer, Robert J., *Gun Law History in the U.S. and Second Amendment Rights*, Vol. 80: 55, pg. 73.
[6] *Gun Law History in the United States and Second Amendment Rights,* pg. 76.
[7] *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms* at pg. 271.
[8] *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms* at pg. 271.

### III. Silencers are lawfully regulated under the National Firearms Act

Firearm silencers are not "arms" within the meaning of the Second Amendment. Even if silencers are "arms," they are "dangerous or unusual weapons" under the reasoning of *Heller*, *supra*, at 627. Additionally, the National Firearms Act's ("NFA") registration and taxation requirements do not "infringe" on the right to keep and bear arms. Even assuming they do, however, the requirements are nevertheless analogous to historical laws regulating commerce in firearms.

**A. Silencers are not "arms" within the meaning of the Second Amendment.**

The Second Amendment "does not imperil every law regulating firearms." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (plurality opinion). Indeed, *Heller* held that the Second Amendment applies to "bearable arms." 554 U.S. at 582. According to the Court, "the most natural reading of [the phrase] 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* Although that protection might extend to things necessary to use arms, such as certain magazines and ammunition, or even access to firing ranges—*see, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)—it does not automatically apply to anything that can be attached to a firearm, but which is not otherwise necessary to render the firearm operable. A firearm silencer is not necessary to make a firearm operable; rather, it is exclusively a means to reduce sound omitted from an already operable firearm. "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *see also United States v. Hasson*, 2019 WL 4573424,

at *3-5 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) ("Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder.").

Nothing in *Bruen* suggests that silencers fall within the meaning of "arms" under the Second Amendment. *Bruen* spoke of "firearm" regulations, not the regulation of firearm accessories. 142 S. Ct. at 2126, 2131. Discussing the historical application of the Second Amendment to "new circumstances," the Supreme Court reiterated that "the Second Amendment extends, prima facie, to all instruments that constitute *bearable arms*, even those that were not in existence at the time of the founding." *Id.* at 2132 (citing *Heller*, 554 U.S. at 582) (emphasis added). As already discussed, a silencer is not such an arm. Indeed, the very right at issue in *Bruen* was an individual's ability to lawfully possess a *handgun* for self-defense outside of the home. *Id.* at 2122. *Bruen* did not directly address, or somehow constitutionally shield, an individual's right to possess accessories that merely quiet an otherwise bearable arm. Therefore, the Second Amendment does not protect silencers from regulation and restriction.

> **B. Even if silencers are "arms," they are "dangerous or unusual weapons" under the reasoning of *Heller*.**

Even assuming that silencers are arms within the meaning of the Second Amendment, the NFA's restrictions on silencers are well in line with what the Supreme Court's decision in *Heller* recognized (and Justice Kavanaugh's concurrence in *Bruen* echoed) to be the "historical tradition of prohibiting the carrying of

'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. For example, under English common law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone Commentaries *148. In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). Accordingly, the Second Amendment encompasses only arms "of the kind in common use." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179). The Supreme Court has explained that the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self- defense." *Heller*, 554 U.S. at 624. Thus, the common-use limitation—which supports the NFA restrictions at issue here—"is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627; *see also United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (rejecting defendant's Second Amendment-based challenge to constitutionality of NFA and finding that "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes" and therefore fall within "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." (quoting *Heller*, 554 U.S. at 627)); *United States v. Fincher*, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (possession of machinegun was not protected by Second Amendment because machineguns were "not in common use by law-abiding citizens for lawful purposes

and therefore [fell] within the category of dangerous and unusual weapons that the government can prohibit for individual use"), *cert. denied*, 555 U.S. 1174 (2009).

Moreover, the historical record indicates that silencers were perceived as dangerous almost immediately after their invention, and that they were quickly used to facilitate crimes. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 L. & Contemp. Probs. 231, 246-49 (2020). The silencer was invented in the early 1900s and patented in 1908. *Id.* at 246. "Objections to civilian use of silencers appeared almost immediately." *Id.* By 1909, the first state, Maine, had banned the sale or possession of silencers, and New Jersey followed two years later. *Id.* at 247. The primary concern about unregulated possession of silencers was crime, from both typical criminals and hunters/poachers. *Id.* "From 1909 and 1936, at least fifteen states enacted silencer restrictions," including Arizona, Louisiana, Michigan, North Carolina, Pennsylvania, and Wyoming. *Id.* at 248 n.123. Ultimately, the inventor "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id.* at 248 n.125 (*Maxim Bans Gun Silencer*, N.Y. TIMES, May 8, 1930, at 27).

*Bruen* did not undermine *Heller's* recognition of the historical tradition of regulating "dangerous or unusual weapons"—in fact, it reemphasized it. *See Bruen*, 142 S. Ct. at 2143-44. And, unlike handguns, which are "indisputably in 'common use' for self-defense today," silencers (if they are even weapons) are uncommon and not necessary (or truly intended or used) for self-defense. *Id.* at 2143. Silencers remain both dangerous and unusual—especially for self-defense purposes—

regardless of whether they existed at the time of the founding or are comparable to any weapon that did. Thus, the restrictions of silencers at issue in this case fit within the historical tradition of prohibitions recognized by *Heller*. *See* 554 U.S. at 627.

### C. The NFA's registration and taxation requirements do not "infringe" on the right to keep and bear arms.

The NFA's registration and taxation requirements, which applied to the silencer that the Defendant possessed, do not "infringe" on the right to keep and bear arms. Under *Bruen*, the government only needs to address historical analogs "[w]hen the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. 2129-30. The Amendment does not say that the right to keep and bear arms cannot be "burdened in any way," but that it shall not be "infringed."

Administrative burdens that stop far short of disarming law-abiding citizens do not "infringe" the right to keep and bear arms. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). Here, individuals—including, in theory, even the Defendant himself—can lawfully own and transfer silencers, assuming that they follow the registration and taxation requirements. *See generally* 26 U.S.C. Ch. 53. *Heller* and *Bruen* make clear that the government cannot *prohibit* the in-home possession and public carrying of firearms, at least for self-defense purposes. Yet, *Bruen* expressly did not disturb the "shall issues" licensing laws that exist in 43 states. 142 S. Ct. at 2138 n.9. And Justice Kavanaugh's concurrence emphasized that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling

and in laws regarding the use of force, among other possible requirements." 142 S. Ct. at 2162. A registration scheme for silencers is no more burdensome than the kind of requirements the Supreme Court accepted. The statute alleged here does not ban silencer possession; rather, it requires registration and documentation, as well as the payment of appropriate, reasonable taxes. *See* 26 U.S.C. Ch. 53. Thus, such a scheme is constitutional, even if there is no historical analog to it.

>   **D. The NFA's registration and taxation requirements are analogous to historical laws regulating commerce in firearms and, thus, they are part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.**

Based on the above, the Court need not consider whether the NFA's registration and taxation requirements are consistent with the nation's historical tradition of firearm regulation. Nevertheless, the government submits that the relevant statutes are analogous to historical laws regulating commerce in firearms.

"[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall

subjects *inhabiting this colony*." *Id.* at 685 n.18 (emphasis added). And other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685.

States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *Id.* at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and it appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.* Meanwhile, "[t]wentieth century laws extended safety regulations pertaining to gunpowder and other explosives." *Id.*

Like these early laws, the NFA's registration and taxation requirements for silencers do not prohibit possessing or even transferring them. Instead, the statutes at issue merely impose record-keeping and attendant payment requirements to document the items, to help ensure that they can be traced (e.g., when they are believed to have been used in a crime). Although the statutes are not identical to the above historical statutes, *Bruen* explained that the government need only identify a "historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. In this case, the practice of the colonies and the United States of regulating commerce in firearms provides a sufficient historical analog.

IV. **Regulation of short-barreled rifles is also Constitutional**

The Second Amendment does not guarantee an unequivocal right to possess a short-barreled rifle. Over 80 years ago, in *United States v. Miller*, the Supreme Court

determined that the plain text of the Second Amendment does not guarantee a right to possess a short-barreled rifle, stating that "we cannot say that the Second Amendment guarantees the right to keep and bear" an unregistered sawed-off "shotgun having a barrel of less than eighteen inches in length." 307 U.S. 174, 175-78 (1939); *Heller*, 554 U.S. at 625 (reading *Miller* to say that the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

The law banning unregistered short-barreled rifles is supported by analogous historical laws banning dangerous and unusual weapons, as listed above. Regulations frequently targeted the concealment of even those weapons that were not dangerous and unusual. *Bruen*, 142 S. Ct. at 2150 ("The historical evidence from antebellum American" shows that "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."); *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (stating in dicta that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons"). Thus, short-barreled rifles may be banned because they are dangerous and unusual concealable weapons. "It is of course clear from the face of the Act that the [NFA]'s object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992)(plurality opinion); *see also id*. at 526 (Stevens, J., dissenting) ("This statute serves the critical objective of

regulating the manufacture and distribution of concealable" and "dangerous weapons."). The law's history, which indicates that it was passed to address violence by targeting concealed weapons, confirms as much. *See United States v. Gonzales*, 2011 WL 5288727, at *4 & n.3 (D. Utah. Nov. 2, 2011) (unpublished). So does the history of amendments to the law, which indicates that short-barreled rifles "are not typically used for lawful purposes" and "'are primarily weapons of war.'" *Id*. at *5 (citation omitted). In other words, "a long gun with a shortened barrel is both dangerous, because 'its concealability fosters its use in illicit activity,' and unusual, 'because of its heightened capability to cause damage.'" *Cox*, 906 F.3d at 1185 (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010)).

Short-barreled rifles are a far cry from common weapons like handguns, "the most popular weapon chosen by Americans for self-defense in the home," in both nature and number. *Heller*, 554 U.S. at 629. Even compared to the class of dangerous and unusual weapons covered by the NFA, short-barreled guns are relatively uncommon. Notably, there are fewer registered short-barreled rifles (a little over half a million) than destructive devices (3.3 million), machine guns (over 700,000), and silencers (2.6 million).[9] There is thus ample reason to deem short-barreled rifles dangerous and unusual weapons that legislatures may ban or otherwise regulate.

Several courts around the country have similarly rejected challenges to prosecutions under § 5861(d) for possessing unregistered dangerous weapons. *See,*

---

[9] *See,* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2, 16* (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download, at 2.

*e.g., United States v. Wilson*, 979 F.3d 889, 903 (11th Cir. 2020) (rejecting challenge to 26 U.S.C. §§ 5861(d) and 5871, prohibiting possession of unregistered sawed-off shotgun, as barred by *Miller*); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009); *United States v. Grey*, No. 18-CR-00412-CAS-1, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018) (holding that the registration requirement does not violate the Second Amendment); *see also United States v. Miller*, 11 F.4th 944, 955 (8th Cir. 2021) (rejecting challenge to NFA's prohibition of short-barreled shotguns).

Defendant's conduct, therefore, falls outside the Second Amendment's protections. The plain text does not guarantee defendant the right to possess a short-barreled rifle and such a prohibition, as set forth in § 5861(d), is well within the "historical tradition of prohibiting the carrying of 'dangerous and usual weapons.'" *Heller*, 554 U.S. at 627. *Bruen* does not change that result.

V.   **Conclusion.**

For all of the foregoing reasons, the Court should deny the Defendant's motion to dismiss the indictment.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   /s/ *Michael P. Felicetta*
Michael P. Felicetta
Assistant United States Attorney
Florida Bar No. 094468
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
E-mail:   Michael.Felicetta@usdoj.gov

U.S. v. JASON AARON BEATY             Case No. 6:22-cr-95-PGB-DCI

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

> Michael S. Ryan
> Assistant Federal Defender

>                             */s/ Michael P. Felicetta*
>                             Michael P. Felicetta
>                             Assistant United States Attorney
>                             Florida Bar No. 094468
>                             400 W. Washington Street, Suite 3100
>                             Orlando, Florida 32801
>                             Telephone:  (407) 648-7500
>                             E-mail:    Michael.Felicetta@usdoj.gov